UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

)
OSAGE NATION,                                    )
                                                 )
           Plaintiff,                            )
                                                 )
     v.                                          )          Civil Action No. 24-0679 (PLF)
                                                 )
DEPARTMENT OF INTERIOR, et al.,                  )
                                                 )
           Defendants.                           )
_____)

OPINION AND ORDER

The United States Department of the Interior ("DOI") and Doug Burgum,[1] in his

official capacity as Secretary of the Interior (collectively, "defendants"), move for dismissal for

lack of subject matter jurisdiction or, in the alternative, for summary judgment against plaintiff

Osage Nation.  See Defs. Mot. [Dkt. No. 15].[2]  Defendants contend that they have not waived

their sovereign immunity because plaintiff never submitted a valid "final offer" under 25 U.S.C.

§ 5366(c)(6)(A)(iii), and therefore the Court lacks subject matter jurisdiction over plaintiff's

claims.  See Defs. Mot. at 1.  The Court held oral argument on defendants' motion on

---

[1]       Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, current U.S.
Secretary of the Interior Doug Burgum is "automatically substituted" as a party to this litigation.

[2]       The Court has reviewed the following documents in connection with the pending
motion:  Complaint ("Compl.") [Dkt. No. 1]; Defendants' Motion to Dismiss for Lack of
Subject-Matter Jurisdiction or, in the Alternative, for Summary Judgment ("Defs. Mot.")
[Dkt. No. 15]; Plaintiff's Opposition to Defendants' Motion to Dismiss for Lack of Subject
Matter Jurisdiction or, in the Alternative, for Summary Judgment ("Pl. Opp.") [Dkt. No. 17]; and
Defendants' Reply in Further Support of Defendants' Motion to Dismiss for Lack of Subject
Matter Jurisdiction or, in the Alternative, for Summary Judgment ("Defs. Reply") [Dkt. No. 18].

March 24, 2025.  Upon careful consideration of the parties' filings, the oral arguments, and the relevant legal authorities, the Court will grant defendants' motion.

## I.  BACKGROUND

### A.  Statutory Background

In 1975, Congress enacted the Indian Self-Determination and Education Assistance Act ("ISDEAA"), Pub. L. No. 93-638, 88 Stat. 2203 (1975) (codified as amended at 25 U.S.C. §§ 5301 et seq.), "to help Indian tribes assume responsibility for programs or services that a federal agency would otherwise provide to the tribes' members," such as law enforcement, education, healthcare, or probate services.  Navajo Nation v. United States Dep't of Interior ("Navajo Nation II"), 57 F.4th 285, 289 (D.C. Cir. 2023) (quoting Navajo Nation v. United States Dep't of Interior ("Navajo Nation I"), 852 F.3d 1124, 1126 (D.C. Cir. 2017)).

In 1994, Congress added Title IV to the ISDEAA, which provides the legal framework under which eligible Indian tribes may assume responsibility and negotiate funding agreements for the operation of programs or services administered by the DOI.  See Pub. L. 103-413, 108 Stat. 4272 et seq. (1994) (codified as amended at 25 U.S.C. § 5361 et seq.). Under Title IV, the Secretary of the DOI "must, upon a tribe's request, enter a self-determination contract under which the tribe assumes control over federally funded programs formerly administered" by the DOI through the Bureau of Indian Affairs ("BIA").  Navajo Nation II, 57 F.4th at 289 (citing 25 U.S.C. § 5321(a)(1)); see also Menominee Indian Tribe of Wis. v. United States, 577 U.S. 250, 252 (2016).  But "[t]he self-determination contract itself does not specify applicable funding levels."  Navajo Nation II, 57 F.4th at 289.  Specific funding levels are "determined each year through 'annual funding agreements' (AFAs), which 'represent[ ] the

2

negotiated agreement of the Secretary to fund, on an annual basis, the [PSFAs] transferred to an

Indian tribe . . . under the [ISDEAA]." Id. (quoting 25 C.F.R. § 900.6).

        On October 21, 2020, Congress enacted the Practical Reforms & Other Goals to

Reinforce the Effectiveness of Self Governance & Self Determination for Indian Tribes Act

("the PROGRESS Act"). See Pub. L. 116-180, 134 Stat. 866-70 (2020); see also S. REP.

NO. 116-34, at 4 (2019) (explaining that the PROGRESS bill's purpose is "to streamline the

Department of the Interior's process for approving self-governance compacts and annual funding

agreements for Indian programs."). Among other things, the PROGRESS Act amended Title IV

of the ISDEAA to establish procedures for the negotiation of compacts and funding agreements

between the Secretary of the DOI and Indian tribes. See Pub. L. 116-180, 134 Stat. 866-70.

Title IV, as amended, sets forth the procedures to be followed when the Secretary and a Tribe

"are unable to agree, in whole or in part, on the terms of a compact or funding agreement":

> (c) Inability to agree on compact or funding agreement.—
>
> > (1) Final offer.—If the Secretary and a participating Indian Tribe are unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels), the Indian Tribe may submit a final offer to the Secretary.

25 U.S.C. § 5366(c)(1). After the Tribe submits a "final offer," the Secretary must "review and

make a determination with respect to the final offer" within "60 days after the date of receipt of

[the] final offer." Id. § 5366(c)(2). Title IV provides that if the Secretary rejects the "final

offer"—or "one or more provisions or funding levels in a final offer"—the Secretary shall:

> > (i) provide timely written notification to the Indian Tribe that contains a specific finding that clearly demonstrates, or that is supported by a controlling legal authority, that—
> >
> > > (I) the amount of funds proposed in the final offer exceeds the applicable funding level as determined under section 5325(a)(1) of this title;

> (II)  the program that is the subject of the final offer is an inherent Federal function or is subject to the discretion of the Secretary under section 5363(c) of this title;
> (III) the Indian Tribe cannot carry out the program in a manner that would not result in significant danger or risk to the public health or safety, to natural resources, or to trust resources;
> (IV)  the Indian Tribe is not eligible to participate in self-governance under section 5362(c) of this title;
> (V)  the funding agreement would violate a Federal statute or regulation; or
> (VI)  with respect to a program or portion of a program included in a final offer pursuant to section 5363(b)(2) of this title, the program or the portion of the program is not otherwise available to Indian Tribes or Indians under section 5321(a)(1)(E) of this title;

25 U.S.C. § 5366(c)(6)(A).  Lastly, Title IV provides that "[i]f the Secretary rejects a final offer

(or one or more provisions or funding levels in a final offer), the Secretary shall—"

> (iii) provide the Indian Tribe with a hearing on the record with the right to engage in full discovery relevant to any issue raised in the matter, and the opportunity for appeal on the objections raised, except that the Indian Tribe may, in lieu of filing such appeal, directly proceed to initiate an action in a United States district court under section 5331(a) of this title[.]

25 U.S.C. § 5366(c)(6)(A)(iii).

      In sum, the PROGRESS Act amended Title IV of the ISDEAA to empower tribes

to submit a "final offer" if the Secretary and the Tribe are "unable to agree, in whole or in part,

on the terms of a compact or funding agreement."  25 U.S.C. § 5366(c)(1).  The Secretary must

"make a determination" on the Tribe's final offer within 60 days of receipt, id. § 5366(c)(2), and

the Secretary may only reject the final offer based on one of six statutory criteria, one of which is

that the program, service, activity or function ("PSFA") that is the subject of the final offer is an

"inherent Federal function" that cannot be assumed by the Tribe.  See id. § 5366(c)(6)(A)(i)(II).

4

Most pertinent to this case, the PROGRESS Act amended Title IV to provide that:  (1) if the Secretary rejects a Tribe's final offer, the Secretary must provide the Tribe with "a hearing on the record" and "the opportunity for appeal," 25 U.S.C. § 5366(c)(6)(A)(iii); and (2) "in lieu of filing such appeal," the Tribe may "directly proceed to initiate an action in a United States district court under section 5331(a) of [the ISDEAA]."  Id.  Under Section 5331(a), "[t]he United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under [the ISDEAA]."  Id. § 5331(a).

## B.   Regulatory Background

Regulations implementing Title IV of the ISDEAA were promulgated in 2000. See 25 C.F.R. § 1000 (2000) ("the 2000 regulations").  The 2000 regulations "provide[ ] the process and timelines for negotiating . . . an AFA with any bureau."  Id. § 1000.160; see also id. § 1000.81 (defining an "annual funding agreement" or "AFA" as a "legally binding and mutually enforceable written agreement[ ] negotiated and entered into annually between a self-governance Tribe/Consortium and [the] BIA.");  id. §§ 1000.166-179 (providing a detailed process for the negotiation of initial annual funding agreements).  The 2000 regulations describe two phases of the AFA negotiation process:  "(a) The information phase; and (b) The negotiation phase."  Id. § 1000.166.  The "information phase" is an optional precursor to the "negotiation phase."  See id. § 1000.168.  During the information phase, a Tribe may submit "letters of interest" indicating "the Tribe/Consortium's interest in seeking information for the possible negotiation of one or more bureau programs."  Id. § 1000.170.  But tribes are not required to "go through the information phase," and may instead proceed "directly to the negotiation phase."  Id. § 1000.168.

The 2000 regulations require that when a Tribe is prepared to negotiate, it must first submit a written request to the Office of Self-Governance to negotiate an AFA for a specific

BIA program or programs.  See 25 C.F.R. § 1000.173(a) ("To initiate the negotiation phase, an authorized official of the newly selected Tribe/Consortium submits a written request to negotiate an AFA" for a BIA program to the Director of the Office of Self-Governance); see also id. § 1000.2 (explaining that the "Office of Self-Governance . . . [is] the office . . . responsible for the implementation and development of the Tribal Self-Governance Program.").  The regulations also govern how and when the bureau must respond to a Tribe's negotiation request, see id. § 1000.174, how and when negotiations must be conducted during the negotiation phase, see id. § 1000.175, and seven specific issues that the bureau and the Tribe must address at negotiation meetings.  See id. § 1000.176.  The 2000 regulations contemplate that the parties' negotiations will culminate in "an initial draft of the AFA," id. § 1000.176(g), which the bureau and the Tribe will either "execute or disapprove . . . within 30 days" of when "negotiations have been successfully completed . . . or by a mutually agreed upon date."  Id. § 1000.175(c).

The 2000 regulations also contemplate that the Tribe and the BIA may "fail to reach an agreement" on the terms of an AFA.  See 25 C.F.R. § 1000.179.  The regulations provide that if the parties "do not reach agreement during the negotiation phase by the mutually agreed to date for completing negotiations," the Tribe and the BIA "may each make a last and best offer to the other party."  Id. § 1000.179(a).  "If a last and best offer is not accepted within 15 days," the regulations require the BIA to "provide a written explanation to the Tribe/Consortium explaining its reasons for not entering into an AFA for the requested program," and to provide the Tribe with "the applicable statement prescribed in [Subpart R], concerning appeal or review rights."  Id. § 1000.179(b).  Subpart R of the 2000 regulations "prescribes the process Tribes/Consortia may use to resolve disputes with the [DOI] arising before or after execution of an AFA."  Id. § 1000.421.  Under Subpart R, the Tribe may file an

administrative appeal to the Interior Board of Indian Appeals ("IBIA"), see id. § 1000.421(a), but

may alternatively "appeal decisions of [DOI] officials relating to the self-governance program to

an appropriate Federal court," as authorized by applicable law.  See id. § 1000.438.

Recall that in 2020, Congress amended Title IV of the ISDEAA.  See The

PROGRESS Act, Pub. L. 116-180, 134 Stat. 867.  Congress directed the Secretary of the DOI

"to negotiate and promulgate such regulations as are necessary to carry out [Title IV, as amended

by the PROGRESS Act]."  Pub. L. 116-180, 134 Stat. 877 (codified at 25 U.S.C. § 5373(a)(1)).

Congress further provided that "[Title IV, as amended by the PROGRESS Act] shall supersede

any conflicting provision of law (including any conflicting regulations)."  25 U.S.C.

§ 5373(d)(2)).  When plaintiff filed the instant suit in March 2024, new regulations implementing

Title IV, as amended by the PROGRESS Act, had been proposed but were not yet final.[3]

## C.  Factual Background

Plaintiff is "a federally recognized Indian tribe with approximately 25,682

members [that] is headquartered in Pawhuska, Oklahoma."  Compl. ¶ 2.  The BIA is a federal

agency within DOI that "compacts and contracts on behalf of the United States with Indian tribes

and tribal organizations under [the ISDEAA] to carry out various Indian programs."  Id. ¶ 3.  The

BIA provides PSFAs "for [p]laintiff through its Osage Agency, an office located in Pawhuska,

Oklahoma."  Defs. Mot. at 6.  The PSFAs at issue in this case are:  (i) Executive Direction;

(ii) Energy and Minerals (also called "Minerals" or "Minerals and Mining");  (iii) Probate;

---

[3]    On January 10, 2025, the DOI promulgated final regulations implementing
Title IV of the ISDEAA, as amended by the PROGRESS Act.  See 89 Fed. Reg. 100228
(codified at 25 C.F.R. § 1000).  The parties agree that these new regulations are not applicable to
this case.  See Defs. Reply. at 18 ("It is uncontested that the regulations in effect at the time of
the suit apply and not any merely proposed regulations."); see also Pl. Opp. at 13 n.7 ("The
recently proposed draft regulations for final offers under Title IV . . . are inapplicable here.").

(iv) Real Estate Services (also called "Realty");  and (iv) Trust Services.  <u>See</u> Defs. Mot. at 6; <u>see</u> <u>also</u> Compl. at Ex. 1 (Pl. Oct. 2023 Letter) [Dkt. No. 1-1] at 6.  The Osage Agency is one of six BIA agencies located within the Eastern Oklahoma Region, which is overseen by the Eastern Oklahoma Regional Office (the "Regional Office") within the BIA.  <u>See</u> Defs. Mot. at 6.

Plaintiff has a self-governance compact and an associated funding agreement with the BIA pursuant to Title IV of the ISDEAA.  <u>See</u> Pl. Opp. at 7 (citing 25 U.S.C. §§ 5363, 5364). Under these agreements, plaintiff has previously assumed responsibility, and associated funding, for performing a number of PFSAs "relating to real estate and natural resources on the Osage Reservation."  <u>Id</u>.  For example, in 2019, plaintiff and the Secretary of the DOI executed a multi-year funding agreement for fiscal years 2020-2025 that identifies the PSFAs for which plaintiff assumed responsibility from the BIA's Osage Agency.  <u>See</u> Defs. Mot. at Ex. 1 (Multi-Year AFA) [Dkt. No. 15-3] at 1; <u>see</u> <u>also</u> Pl. Opp. at Ex. 1 (Plaintiff's Response to Defendants' Statement of Material Facts) ("Pl. Resp. to Defs. SOMF") [Dkt. No. 17-2] ¶ 3.

The Multi-Year AFA included Real Estate Services, but did not include Executive Direction, Trust Services, Probate or Minerals.  <u>See</u> Multi-Year AFA at 1; <u>see</u> <u>also</u> <u>id</u>. at 2 ("Any [PSFA] not listed as transferred to [plaintiff] shall be assumed to be a retained function of the Secretary."); Pl. Resp. to Defs. SOMF ¶ 4.  Attached to the Multi-Year AFA is a "Reprogramming Request" which shows the amount of funding to be transferred or "reprogrammed" to plaintiff each year for the performance of the PSFAs for which plaintiff has assumed responsibility.  <u>See</u> Multi-Year AFA at 10-13; <u>see</u> <u>also</u> Pl. Resp. to Defs. SOMF ¶ 4. Plaintiff therefore assumed responsibility for the Real Estate Services program, while the BIA retained responsibility for operating the Executive Direction, Trust Services, Probate, and Minerals programs as of 2021.  <u>See</u> Defs. Mot. at 7; <u>see</u> <u>also</u> Pl. Resp. to Defs. SOMF ¶ 4.

On January 26, 2021, "[p]laintiff submitted a written request to the Office of Self-Governance to begin incurring pre-award costs necessary to plan, prepare for, and assume operation of the Probate and Minerals programs."  Defs. Mot. at 7; see also id. at Ex. 2 (Approval of Pre-Award Costs) [Dkt. No. 15-4] at 3-4; Pl. Resp. to Defs. SOMF ¶ 7.  On April 23, 2021, the Office of Self-Governance approved plaintiff's request to begin incurring pre-award costs.  See Defs. Mot. at Ex. 2 (Approval of Pre-Award Costs) at 1-2; see also Pl. Resp. to Defs. SOMF ¶ 8.  In 2021, plaintiff and the BIA engaged in negotiations to transfer responsibility for the Probate program to plaintiff.  See Defs. Mot. at 8; see also Compl. at Ex. 1 (Probate negotiations occurred on August 2, 2021) [Dkt. No. 1-1] at 24; Pl. Resp. to Defs. SOMF ¶ 9.  During negotiations, the BIA asserted that funding for some functions of the Probate program must be retained by the BIA "for the performance of inherent Federal functions."  Defs. Mot. at Ex. 4 (May 6, 2021, Probate Response) [Dkt. No. 15-6]; Pl. Resp. to Defs. SOMF ¶ 10.

Defendants allege that after the 2021 negotiations, plaintiff "did not propose an amendment" to the parties' existing Multi-Year AFA "to assume any functions of the Probate program and it did not submit a final offer."  Defs. Mot. at 8.  Plaintiff does not dispute that it "did not submit a written proposal to compact functions of the Probate program" in the course of the parties' 2021 negotiations.  Pl. Resp. to Defs. SOMF ¶ 11; see also Defs. Mot. at Ex. 6 (Sept. 2, 2022, Pre-Award Costs Letter) [Dkt. No. 15-8] at 1 (plaintiff acknowledging that the parties "have not been able to successfully conclude [their] negotiations started in 2021.").

On August 17, 2022, the Office of Self-Governance sent a letter to plaintiff confirming negotiations for August 23, 2022 and August 24, 2022.  See Defs. Mot. at Ex. 7 (Aug. 17, 2022, Negotiations Confirmation) [Dkt. No. 15-9]; see also Pl. Resp. to Defs. SOMF ¶ 12.  The letter confirmed that plaintiff had "requested negotiations for Real Estate Services

(Real Estate Specialist position), Probate, and Minerals/Mining programs." Defs. Mot. at Ex. 7 (Aug. 17, 2022, Negotiations Confirmation) [Dkt. No. 15-9]. The letter further stated that because of pending administrative litigation between the parties "pertaining to Real Estate Services . . . the negotiations for Real Estate Services [would therefore] need to be postponed." Id.; see also Pl. Resp. to Defs. SOMF ¶ 12; Defs. Mot. at 8 (explaining that "[b]ecause the Real Estate Services program was already the subject of administrative litigation[,] . . . only the Probate and Minerals programs would be negotiated.").

 Defendants allege that, on August 23, 2022 and August 24, 2022, plaintiff and the BIA "began negotiations for the Probate and Minerals programs." Defs. Mot. at 8. Plaintiff does not dispute "that negotiations for the Probate and Minerals programs were conducted on August 23-24, 2022," but plaintiff "dispute[s] that they began then." Pl. Resp. to Defs. SOMF ¶ 13 (emphasis added). With respect to the Probate program, plaintiff and the BIA "began discussions with the [BIA's] May 6, 2021, letter explaining why the [PSFAs] of the Probate program are inherent Federal functions that cannot be assumed by Plaintiff." Defs. Mot. at 8-9 (citing id. at Ex. 4 (May 6, 2021, Probate Response) [Dkt. No. 15-6]). Plaintiff requested more information about which Probate functions may be inherent Federal functions, but "[n]o further discussions were resumed in the negotiation meetings regarding Probate functions or the Osage Agency Probate program funding." Defs. Mot. at 9; see also Pl. Resp. to Defs. SOMF ¶¶ 14, 16.

 After the parties discussed Probate, discussions shifted to the Minerals program. See Defs. Mot. at 9; see also Pl. Resp. to Defs. SOMF ¶ 17. Plaintiff and the BIA first discussed the different branches of the Minerals program, but then plaintiff announced its intention to assume responsibility for only the Branch of Field Operations of the Minerals program for fiscal year 2023. See Defs. Mot. at 9; see also Pl. Resp. to Defs. SOMF ¶ 17. Defendants allege that

the remainder of the negotiations conducted on August 23, 2022, "as well as the negotiations on August 24, 2022, focused exclusively on the logistics of Plaintiff assuming the Branch of Field Operations, including whether Plaintiff could assume the functions and funding of the Branch of Field Operations mid-fiscal year . . . and what would happen to existing Branch of Field of Operations employees—whether they would be hired directly by Plaintiff as tribal employees or be assigned to Plaintiff pursuant to an Intergovernment Personnel Agreement." Defs. Mot. at 9-10; see also Pl. Resp. to Defs. SOMF ¶ 18 (stating that the negotiations on August 23 and 24, 2022 "focused primarily on the Branch of Field Operations.") (emphasis added).

Defendants allege that the parties' "[n]egotiations did not conclude on August 24, 2022 . . . because the Bureau and Plaintiff had not come to an agreement on the logistics of Plaintiff assuming the Branch of Field Operations." Defs. Mot. at 10 (citing id. at Ex. 10 (Sept. 1, 2022, "Osage Negotiations" Email) [Dkt. No. 15-12] (emails exchanged between the parties discussing follow-up meetings regarding the transfer of certain PSFAs mid-year)); see also Pl. Resp. to Defs. SOMF ¶ 20 (simply stating that "[t]he email speaks for itself.").

On September 2, 2022, plaintiff sent three letters to the BIA following up on the August 23-24, 2022 negotiations. See Defs. Mot. at 10. In plaintiff's first letter, plaintiff requested "additional information," including "an updated detailed list of inherent federal functions in each branch of the Mineral program," information about the Osage Agency and the Regional Office, and information about the Branch of Field Operations within the Minerals program. Defs. Mot. at 10-11 (quoting id. at Ex. 11 (Sept. 2, 2022, Minerals Letter) [Dkt. No. 15-13]). In the letter, plaintiff "did not request to assume any particular functions" of any Osage Agency program, see id. at 11, but plaintiff did state that it "ultimately . . . want[ed] to get to the reorganization of the [Osage] Agency to allow [plaintiff] to contract all non-inherently

federal agency functions." Id. at Ex. 11 (Sept. 2, 2022, Minerals Letter) at 2. Plaintiff does not

dispute that it sent the BIA the "Minerals Letter" on September 2, 2022, but asserts that

"[t]he contents of that letter speak for themselves." Pl. Resp. to Defs. SOMF ¶ 22.

      In plaintiff's second September 2, 2022, letter, plaintiff followed up on the

parties' Probate negotiations. See Defs. Mot. at Ex. 8 (Sept. 2, 2022, Probate Letter)

[Dkt. No. 15-10]. Plaintiff stated that the letter would "serve as [its] request for additional

information concerning Probate, and specifically relating to the intake process for initiation of

revocable trusts." Id. at 1. In the letter, plaintiff did not request to assume any functions of the

Probate program or to execute a Reprogramming Request transferring funds for the

administration of the program. See id. But plaintiff did express an interest in "assum[ing] as

much of the Probate program as possible." Id. at 2; see also Defs. Mot. at 11. Plaintiff does not

dispute that it sent the BIA the "Probate Letter" on September 2, 2022, but asserts that "[t]he

contents of that letter speak for themselves." Pl. Resp. to Defs. SOMF ¶ 23.

      In plaintiff's third September 2, 2022, letter, plaintiff discussed the pre-award

costs that it originally requested from the Office of Self-Governance in 2021. See Defs. Mot. at

Ex. 6 (Sept. 2, 2022, Pre-Award Costs Letter) [Dkt. No. 15-8]. Plaintiff stated that because the

parties had "not been able to successfully conclude [their] negotiations started in 2021," plaintiff

needed an extension of pre-award costs from the Office of Self-Governance. Id. at 1. Plaintiff

asserted that it still "anticipate[d]" assuming the Minerals and Probate programs, but was unsure

whether it would assume the two programs in their entirety or only "some portions" of them. Id.

Plaintiff does not dispute that it sent the "Pre-Award Costs Letter" on September 2, 2022, but

asserts that "[t]he contents of that letter speak for themselves." Pl. Resp. to Defs. SOMF ¶ 24.

The parties held a meeting on September 15, 2022 to discuss unresolved issues from the August 23 and August 24, 2022 negotiation meetings.  See Defs. Mot. at 12; see also id. at Ex. 12 (Sept. 15, 2022, Agenda) [Dkt. No. 15-14]; Pl. Resp. to Defs. SOMF ¶ 25.  After that meeting, the parties scheduled the "next negotiation meeting" for September 26, 2022.  See Defs. Mot. at 12; see also id. at Ex. 12 (Sept. 15, 2022, Agenda) ("Next negotiation meeting scheduled for 9/26 at 1:00pm CST.").  The BIA responded to plaintiff's September 2, 2022, "Probate Letter" and plaintiff's September 2, 2022, "Minerals Letter" on September 23, 2022, and September 28, 2022, respectively.  See Defs. Mot. at 12; see also id. at Ex. 13 (Sept. 23, 2022, Probate Letter) [Dkt. No. 15-15]; id. at Ex. 14 (Sept. 28, 2022, Minerals Letter) [Dkt. No. 15-16]. In the two response letters, the BIA provided additional information and other responses to plaintiff's inquiries concerning the Probate and Minerals programs.  See Defs. Mot. at 12.

On September 29, 2022, the parties conducted a follow-up negotiation meeting to discuss, among other things, plaintiff's requests for information in its three September 2, 2022 letters.  See Defs. Mot. at 12 (citing id. at Ex. 15 (Sept. 29, 2022, Negotiations Agenda) [Dkt. No. 15-17]); see also Pl. Resp. to Defs. SOMF ¶ 28.  At that meeting, the parties discussed the amount of funding the BIA would transfer to plaintiff if plaintiff assumed the Branch of Field Operations within the Minerals program.  See Defs. Mot. at 12; see also Pl. Resp. to Defs. SOMF ¶ 28.  During the meeting, the Office of Self-Governance requested that plaintiff draft a proposed amendment to the parties' Multi-Year AFA (fiscal years 2020-2025) to specify plaintiff's intent to assume responsibility for the Branch of Field Operations within the Minerals program, and also to specify the amount of funding plaintiff was requesting to operate the Branch of Field Operations.  See Defs. Mot. at 12; see also Pl. Resp. to Defs. SOMF ¶ 28.

On October 5, 2022, plaintiff and the BIA "held what would end up being their final negotiation meeting."  Defs. Mot. at 13; see also Pl. Resp. to Defs. SOMF ¶ 29.  At that meeting, plaintiff and the BIA "continued to discuss the 'timeline/activities for transition of [Field Operations] employees.'"  Defs. Mot. at 13 (quoting id. at Ex. 16 (Oct. 5, 2022, Negotiations Agenda) [Dkt. No. 15-18]); see also Pl. Resp. to Defs. SOMF ¶ 29.  At the October 5, 2022 meeting, the parties also discussed a draft amendment to the parties' Multi-Year AFA that plaintiff had prepared in advance of the meeting.  See Defs. Mot. at 13; see also Pl. Resp. to Defs. SOMF ¶ 30.  Plaintiff's draft amendment proposed that plaintiff would "assume[] responsibility for the BIA Osage Agency Branch of Field Operations."  Defs. Mot. at Ex. 17 (Draft Amendment) [Dkt. No. 15-19]; see also Defs. Mot. at 13.  Plaintiff left the "effective date" of the draft amendment blank.  See Defs. Mot. at Ex. 17 (Draft Amendment). The draft amendment did not discuss any other part of the Minerals program other than the Branch of Field Operations, nor did it propose that plaintiff would assume any other program. See id.  The draft amendment did, however, reserve plaintiff's "right to negotiate to include other Minerals programs in its [Multi-Year AFA]."  Id.; see also Pl. Resp. to Defs. SOMF ¶ 31.

Plaintiff's draft amendment was not executed on October 5, 2022.  See Defs. Mot. at 13; see also Pl. Resp. to Defs. SOMF ¶ 32.  Defendants assert that plaintiff's draft amendment was not executed because there were "outstanding issues that had to be addressed before the Draft Amendment could be finalized."  Defs. Mot. at 28.  For example, the parties had to "determine the effective date of the amendment," see id., which was "left blank in the draft."  Id. at 13.  Defendants also allege that the parties had not yet resolved whether plaintiff could assume the Branch of Field Operations mid-way through the fiscal year, which would dictate the draft amendment's effective date.  See id. at 13, 28.  Defendants further allege that "the parties had not

yet resolved whether Bureau employees of the Branch of Field Operations would be laid off, hired by Plaintiff pursuant to an Intergovernment Personnel Act agreement, or hired directly as tribal employees" after plaintiff assumed the Branch of Field Operations.  Defs. Mot. at 28. Plaintiff does not dispute that its draft amendment was not executed on October 5, 2022, but asserts that it "lacks knowledge of the reasons why."  Pl. Resp. to Defs. SOMF ¶ 32.

       The parties scheduled a follow-up meeting for October 25, 2022, but on October 19, 2022, plaintiff unilaterally cancelled the October 25, 2022 meeting, stating: "This meeting is being postponed to a later date to be determined within the next few weeks." Defs. Mot. at 13-14 (quoting id. at Ex. 19 (Oct. 19, 2022, Canceled Calendar Invitation) [Dkt. No. 15-21]); see also Pl. Resp. to Defs. SOMF ¶¶ 33, 34.  Plaintiff did not propose any date to resume negotiations.  See Defs. Mot. at 14; see also Pl. Resp. to Defs. SOMF ¶ 34.

       On November 1, 2022, an Office of Self-Governance employee sent one of plaintiff's directors an e-mail requesting a date for the rescheduled negotiations meeting, stating that the Office of Self-Governance "ha[d] not heard anything since the cancelation of the 10/25 meeting."  Defs. Mot. at Ex. 20 (Nov. 1, 2022, Email) [Dkt. No. 15-22] at 1; see also Pl. Resp. to Defs. SOMF ¶ 35.  Plaintiff replied that it was "still developing [its] request and transition plan, as well as reviewing the last [Regional Office] response," and that it "hope[d] to have something ready in the next two weeks."  Defs. Mot. at Ex. 20 (Nov. 1, 2022, Email) at 1.

       Then, on November 2, 2022, plaintiff sent a letter announcing that it "intends to assume all branches available at the Osage Agency under Minerals and Mining."  Defs. Mot. at Ex. 21 (Nov. 2, 2022, Minerals Letter) [Dkt. No. 15-23] at 1.  The letter stated that, "[i]n preparation of assuming all other branches [of the Minerals program], [plaintiff] would like to request additional information."  Id.  The letter did not propose a date to reschedule the cancelled

October 25, 2022 negotiation meeting and did not include a draft amendment to the parties' Multi-Year AFA.  See id.; see also Defs. Mot. at 14.  Plaintiff does not dispute that it sent the November 2, 2022, Letter, and asserts that the "contents of that letter speak for themselves." Pl. Resp. to Defs. SOMF ¶ 36.  Plaintiff does note, however, that the "letter requested detailed information" regarding branches under the Minerals program other than the Branch of Field Operations, such as "Executive Direction, Real Estate/Probate, Enforcement/Lease Compliance, Lease Management, Subsurface Leasing, and Oil and Gas Accounting."  Id.

On November 15, 2022, counsel for plaintiff sent an e-mail to counsel for the BIA stating that plaintiff "had submitted a new information request on November 2, 2022 that repeated requests for information previously made and that [plaintiff] should receive the information within 30 days or else the [BIA] should explain why it cannot be provided and a date by which it will be provided."  Pl. Resp. to Defs. SOMF ¶ 38 (citing Defs. Mot. at Ex. 24 (Nov. 15, 2022, Email) [Dkt. No. 15-26]).  In the e-mail, plaintiff's counsel stated that she "would like thirty days from the date of receipt of the information" for plaintiff's "staff and consultants" to "review and discuss how [plaintiff] would like to move forward with negotiations."  Defs. Mot. at Ex. 24 (Nov. 15, 2022, Email).  Counsel explained that if she could "receive the information by December 2, 2022 or soon thereafter," then she was "hopeful" that they could "begin discussions regarding the transfer of contractible PSFAs by mid-January."  Id.

On November 30, 2022, the Office of Self-Governance sent plaintiff an e-mail stating that plaintiff's November 2, 2022, Letter had "caused confusion about next steps in the [fiscal year] 2023 negotiations."  Defs. Mot. at Ex. 22 (Dec. 1, 2022, Email re: Negotiations) [Dkt. No. 15-24].  The Office of Self-Governance requested that plaintiff clarify:  (a) whether it "[i]ntends to move forward with compacting" the Branch of Field Operations of the Minerals

program "as was previously under consideration," (b) whether it "is also requesting to compact funding for the other branches of [the Minerals program]," or "(c) whether compacting of Field Operations is being postponed until [fiscal year] 2024 or a later date in order to comprehensively compact eligible funding for the entire [Minerals] program."  Defs. Mot. at 14-15; <u>see also</u> <u>id.</u> at Ex. 22 (Dec. 1, 2022, Email re: Negotiations); Pl. Resp. to Defs. SOMF ¶ 37.

On December 1, 2022, plaintiff replied that it had "requested additional information" and would need to "evaluate" that information "before [it] ma[de] decisions that [the Office of Self-Governance] sighted" in its e-mail.  Defs. Mot. at Ex. 22 (Dec. 1, 2022, Email re: Negotiations) [Dkt. No. 15-24].  Plaintiff explained that it believed it had indicated in its November 2, 2022, Letter and "on the calls" that it was "now considering taking all the Osage tribal shares for Minerals and Mining."  <u>Id.</u>  Plaintiff inquired when it could expect the additional information that it requested in its November 2, 2022, Letter.  <u>See id.</u>; <u>see also</u> Pl. Resp. to Defs. SOMF ¶ 38; Defs. Mot. at Ex. 21 (Nov. 2, 2022, Minerals Letter) [Dkt. No. 15-23].

The next day, on December 2, 2022, the BIA sent an initial response to plaintiff's November 2, 2022, Letter.  <u>See</u> Defs. Mot. at Ex. 23 (Dec. 2, 2022, Response) [Dkt. No. 15-25]. The BIA "treated Plaintiff's November 2 letter as a 'letter of interest,' noting that it was responding '[i]n accordance with 25 C.F.R. § 1000.172.'"  Defs. Mot. at 15 (quoting <u>id.</u> at Ex. 23 (Dec. 2, 2022, Response) at 1); <u>see also</u> 25 C.F.R. § 1000.172(a)(1) (2000) (directing the BIA to, "[w]ithin 15 calendar days of receipt of a Tribe/Consortium's letter of interest . . . provid[e] all budget and program information" requested by the Tribe, subject to some restrictions).  In its response letter, the BIA recognized that plaintiff was "still evaluating and developing its request and plan for assumption," but stated that it assumed that plaintiff "no longer intend[ed] to proceed with negotiating and drafting a funding agreement for [plaintiff's] assumption of the

[Branch of] Field Operations" within the Minerals program, which had been "the sole subject of all previous Minerals negotiation."  Defs. Mot. at Ex. 23 (Dec. 2, 2022, Response) at 1.

Plaintiff does not dispute that the BIA sent plaintiff the December 2, 2022, Letter, but counters that the Branch of Field Operations was not "the <u>sole</u> subject of all previous Minerals negotiations."  Pl. Resp. to Defs. SOMF ¶ 39 (emphasis added).  Rather, plaintiff asserts that it had "initially discussed the entire Minerals program with the [BIA]" during prior negotiations, but had "then focused on [the Branch of] Field Operations as an initial step."  <u>Id</u>.; <u>see also</u> Defs. Mot. at Ex. 7 (Aug. 17, 2022, Negotiations Confirmation) [Dkt. No. 15-9].

On February 6, 2023, the BIA provided a supplemental response to plaintiff's November 2, 2022, Letter.  <u>See</u> Defs. Mot. at Ex. 26 (Feb. 6, 2023, Supp. Resp.) [Dkt. No. 15-28].  Responding to plaintiff's request that the BIA "identify inherent federal functions performed by each position at the [Osage] Agency and quantify the percentage of inherent federal functions for each position,"  the BIA stated that inherent federal functions "are not necessarily specific to certain positions and, therefore, are not easily quantifiable as such for each position."  <u>Id</u>. at 1.  After receiving both of the BIA's response letters, plaintiff did not request to resume negotiations and did not submit an updated draft amendment to assume any other PSFAs.  <u>See</u> Defs. Mot. at 16; <u>see also</u> Pl. Resp. to Defs. SOMF ¶ 43.  "Plaintiff also never submitted a proposed 'transition plan' regarding employees of the Branch of Field Operations from the [BIA] to Plaintiff as it had said was forthcoming 'in the next two weeks' on November 1, 2022."  Defs. Mot. at 16; <u>see also</u> Pl. Resp. to Defs. SOMF ¶ 44.

Finally, on October 23, 2023, plaintiff sent a letter to the BIA titled "Osage Nation Final Offer Amendment to 2020-2025 Funding Agreement."  Compl. at Ex. 1 (Pl. Oct. 2023 Letter) [Dkt. No. 1-1] at 2; <u>see also</u> Pl. Resp. to Defs. SOMF ¶ 45.  Plaintiff's

October 23, 2023, Letter stated that it would be plaintiff's "final offer to amend

its . . . 2020-2025 [Multi-Year AFA]."  Pl. Oct. 2023 Letter at 1; see also Pl. Resp. to Defs.

SOMF ¶ 45.  In the October 23, 2023, Letter, plaintiff proposed that it assume "[a]ll PSFAs

associated with the Osage Agency . . . of the [BIA] that have not previously been assumed by

[plaintiff], including but not limited to Realty, Minerals/Mining, Probate, Trust Services, and

Executive Direction PSFAs."  Pl. Oct. 2023 Letter at 1.  Plaintiff also proposed that it assume its

"full, proportional share of all Realty, Minerals/Mining, Probate, Trust Services, and Executive

Direction PSFAs associated with the Eastern Oklahoma Regional Office . . . of the BIA."  Id.

Plaintiff further asserted that the PSFAs included in the letter were "the subject of multiple

negotiations and information exchanges."  Defs. Mot. at 18 (quoting Pl. Oct. 2023 Letter at 2).

Describing the "multiple negotiations and information exchanges," plaintiff

cited:  (i) the Probate negotiations on August 2, 2021; (ii) the Probate and Minerals negotiations

on August 23-24, 2022; and (iii) the follow-up negotiations on September 15, 2022;

September 29, 2022; and October 5, 2022.  See Defs. Mot. at 18 (quoting Pl. Oct. 2023 Letter

at 2 n.1).  Exhibit B of plaintiff's letter cites "Earlier Correspondence" from October 2014

through October 2016.  See Defs. Mot. at 18 (citing Pl. Oct. 2023 Letter at 24).  Exhibit B also

lists "offers from" the BIA with respect to the Probate, Minerals (including the Branch of Field

Operations), and Trust Services programs.  Id. (citing Pl. Oct. 2023 Letter at 25).

Defendants assert that these so-called "offers" were "simply responses to

Plaintiff's requests for additional information about the programs which could serve as a starting

point for potential negotiations in the future."  Defs. Mot. at 18.  Defendants further assert that

plaintiff's October 23, 2023, Letter "does not identify any 'offers' from the [BIA] with respect to

the Executive Direction program or any part of any [PSFAs] administered at the Regional

Office."  Defs. Mot. at 19.  In response, plaintiff asserts that the contents of its October 23, 2023, Letter and Exhibit B to the letter "speak for themselves."  <u>See</u> Pl. Resp. to Defs. SOMF ¶¶ 45-56.

On November 17, 2023, the DOI acknowledged receipt of plaintiff's October 23, 2023, Letter.  <u>See</u> Defs. Mot. at 19; <u>see also</u> <u>id</u>. at Ex. 27 (Nov. 17, 2023, Acknowledgement) [Dkt. No. 15-29].  Three days later, the BIA responded to plaintiff, stating that plaintiff's October 23, 2023, Letter was "procedurally premature" because plaintiff and the BIA had not negotiated the PSFAs that were included.  Defs. Mot. at Ex. 3 (Nov. 20, 2023, Initial Response) [Dkt. No. 15-5] at 1.  The BIA "respectfully request[ed] that [plaintiff] withdraw" its "final offer" and "engage in and complete formal negotiations."  <u>Id</u>.  "Without such negotiations," the BIA explained, plaintiff's October 23, 2023, Letter did not "comply with [the ISDEAA's] requirements for the submission of a final offer."  <u>Id</u>.  The BIA also emphasized that its response was "not a declination of the [October 23, 2023, Letter] pursuant to 25 U.S.C. § 5366" because, according to defendants, plaintiff's October 23, 2023, Letter was "not a valid final offer," and plaintiff therefore "was not entitled to file suit in federal court."  <u>Id</u>.

On December 1, 2023, plaintiff declined to withdraw its October 23, 2023, Letter, asserting that defendants' request to complete negotiations was "<u>prima</u> <u>facie</u> evidence of the inability of the parties to agree."  Defs. Mot. at 19; <u>see also</u> <u>id</u>. at Ex. 28 (Dec. 1, 2023, Pl. Resp.) [Dkt. No. 15-30]); Pl. Resp. to Defs. SOMF ¶ 61.  On December 20, 2023, the BIA again explained that plaintiff's "final offer" was not "negotiated by [plaintiff] in accordance with [the ISDEAA] and its implementing regulations and is therefore not a 'final offer' within the meaning of" the ISDEAA.  Defs. Mot. at 20; <u>see also</u> <u>id</u>. at Ex. 5 (Dec. 20, 2023, Rejection) [Dkt. No. 15-7] at 1.  Specifically, defendants stated that plaintiff failed to:  (i) initiate negotiations for certain programs, (ii) complete negotiations and submit a draft funding

agreement for other programs, and (iii) include information in a draft funding agreement required

by the ISDEAA and its implementing regulations.  See Defs. Mot. at Ex. 5 (Dec. 20, 2023,

Rejection) at 1; see also id. at 5 ("For the Real Estate Services, Probate, Trust Services, and

Minerals and Mining programs, although informal information gathering and negotiations may

have occurred at various times, some of these negotiations occurred nearly a decade ago and, in

any event, were never completed as required by the statute and its implementing regulations.").

           In the alternative, defendants stated that if plaintiff's October 23, 2023, Letter was

deemed a valid "final offer," the Secretary of the DOI partially rejected the offer because it

requested more money than the Secretary was spending for the same programs.  See Defs. Mot.

at Ex. 5 (Dec. 20, 2023, Rejection) [Dkt. No. 15-7] at 9-15.  Defendants also stated that

plaintiff's "final offer" requested to assume programs that are inherent Federal functions that

may not be delegated to Indian tribes, see id. at 15-36, and plaintiff "would not have made these

errors if it had engaged in negotiation."  Defs. Mot. at 20; see also id. at Ex. 5 (Dec. 20, 2023,

Rejection) at 12 ("[B]ecause [plaintiff] did not engage in negotiations regarding the Regional

Office programs, it has mistakenly requested funding for programs that do not provide direct

services to [plaintiff] and/or funds used to perform only inherently federal functions.").

### D.  Procedural Background

           On March 11, 2024, plaintiff filed the instant lawsuit against defendants.

See Compl.  Plaintiff sought "relief for Defendants' violations of the [ISDEAA] by declining and

rejecting a final offer by [plaintiff] to amend its multi-year funding agreement with the [BIA] to

allow [plaintiff] to assume responsibility and related funding for certain programs, functions,

services and activities of the BIA's Osage Agency Office and its Eastern Oklahoma Regional

Office."  Compl. ¶ 1.  Plaintiff asks the Court to declare "that [plaintiff's] final offer to BIA of

October 23, 2023 is accepted and that BIA must transfer the responsibility and related funding for all the PFSAs at issue to [plaintiff]." Id. at 5 (Prayer for Relief). Plaintiff also asks the Court to compel "[d]efendants to accept [plaintiff]'s final offer of October 23, 2023 and to transfer the responsibility and related funding for all the PFSAs at issue to [plaintiff]." Id. Defendants filed their answer to plaintiff's complaint on June 18, 2024. See Answer [Dkt. No. 10].

On September 11, 2024, defendants moved to dismiss plaintiff's complaint for lack of subject matter jurisdiction or, in the alternative, for summary judgment. See Defs. Mot. Defendants note that the ISDEAA "waives the United States' sovereign immunity . . . if the Secretary of Interior rejects a 'final offer' submitted by a Tribe." Id. at 24; see also 25 U.S.C. § 5331(a). Defendants contend that "[a] statutory and regulatory prerequisite to the submission of a final offer and the Bureau's determination with respect thereto, however, is that the Tribe and the Bureau 'negotiate' but be 'unable to agree . . . on the terms' of a funding agreement." Id. (citing 25 U.S.C. §§ 5363(a), 5366(c)(1), and 25 C.F.R. §§ 1000.160-182). Defendants argue that "Plaintiff and the Bureau never reached a point where they were 'unable to agree' on the [PSFAs] included in Plaintiff's October 23, 2023, Letter because they did not 'negotiate' those [PSFAs] in accordance with the [ISDEAA] and the process prescribed in its regulations." Id. at 25. Therefore, defendants argue, "[p]laintiff never submitted a final offer[,] . . . the United States has not waived its sovereign immunity from suit for a rejection of any final offer, [and] [t]his Court therefore lacks subject-matter jurisdiction and must dismiss [p]laintiff's case." Id.

Plaintiff filed its opposition to defendants' motion on September 25, 2024. See Pl. Opp. Defendants replied on October 16, 2024. See Defs. Reply. The Court held oral argument on defendants' motion on March 24, 2025. See Minute Entry of March 24, 2025. On March 26, 2025, the Court issued a memorandum opinion and order notifying the parties that the

Court "[would] not issue a decision on defendants' pending motion at [that] time," and "urge[d] the parties to resume negotiations."  See Mem. Op. and Order [Dkt. No. 20] at 2.  The Court also directed the parties to file a joint report on the status of negotiations by June 24, 2025.  See id.

On June 24, 2025, the parties filed a joint status report notifying the Court that the parties resumed negotiations in May 2025.  See Joint Status Report ("JSR") [Dkt. No. 21] at 2. But they further advised that "at the conclusion of the recommenced negotiations, the parties remain[ed] in disagreement over" funding levels for the PSFAs included in plaintiff's October 23, 2023, Letter.  Id. at 3.

## II.   LEGAL STANDARD

In the D.C. Circuit, motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure raising sovereign immunity are construed as motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  See, e.g., Kirkham v. Société Air Fr., 429 F.3d 288, 291 (D.C. Cir. 2005) (treating motion for summary judgment that raised sovereign immunity argument as a motion to dismiss for lack of subject matter jurisdiction, explaining that summary judgment "represents a decision on the merits, which courts may render only after jurisdiction has been established."); Leopold v. Manger, 630 F. Supp. 3d 71, 74 (D.D.C. 2022) (construing motion for summary judgment arguing that sovereign immunity deprives court of jurisdiction as a motion to dismiss for lack of subject matter jurisdiction); Kiakombua v. Wolf, 498 F. Supp. 3d 1, 21 (D.D.C. 2020) (construing motion styled as motion for summary judgment under Rule 56 "as a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) or, in the alternative, a motion for summary judgment under Rule 56(a)" (emphasis in original)); Whiteru v. WMATA, 258 F. Supp. 3d 175, 181-82 (D.D.C. 2017) (construing motion for summary judgment under Rule 56

on the basis of sovereign immunity as a motion to dismiss under Rule 12(b)(1)).  Defendants'

motion for summary judgment therefore will be construed as a motion to dismiss for lack of

subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

   To survive a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil

Procedure, the plaintiff bears the burden of establishing that the Court has subject matter

jurisdiction over the claim at issue.  See Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015); see

also Bailey v. Fed. Bureau of Prisons ("Bailey"), 780 F. Supp. 3d 96, 112 (D.D.C. 2025).  "Lack

of subject matter jurisdiction is fatal to a court's authority to hear a case."  Bailey, 780 F. Supp.

at 112 (citing FED. R. CIV. P. 12(h)(3)).  In determining whether to grant a motion to dismiss for

lack of subject matter jurisdiction under Rule 12(b)(1), the Court must construe the complaint in

plaintiff's favor and treat all well-pleaded factual allegations as true.  See Bailey, 780 F. Supp.

at 113 (citing Attias v. Carefirst, Inc., 865 F.3d 620, 627 (D.C. Cir. 2017)).  Although the Court

must grant plaintiff the benefit of all reasonable inferences, the Court "need not accept factual

inferences drawn by plaintiff if those inferences are not supported by facts alleged in the

complaint," and the Court need not accept plaintiff's legal conclusions.  Disner v. United

States, 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (quoting Speelman v. United States, 461 F.

Supp. 2d 71, 73 (D.D.C. 2006)).  In determining whether plaintiff has established jurisdiction,

the Court may consider materials beyond the pleadings where appropriate.  See Bailey, 780 F.

Supp. at 113 (citing Cumis Ins. Soc'y, Inc. v. Clark, 318 F. Supp. 3d 199, 207 (D.D.C. 2018)).

   "Courts in this district review de novo questions of legal interpretation under the

ISDEAA."  Salt River Pima-Maricopa Indian Cmty. v. Kennedy ("Salt River"), Civil Action

No. 18-02360 (DLF), 2025 WL 2377968, at *3 (D.D.C. Aug. 14, 2025) (citing Jamestown

S'Klallam Tribe v. Azar, 486 F. Supp. 3d 83, 87 (D.D.C. 2020) and Pyramid Lake Paiute

Tribe v. Burwell ("Pyramid Lake"), 70 F. Supp. 3d 534, 541-42 (D.D.C. 2014)).  When

interpreting the ISDEAA, courts apply the "Indian law canon of statutory construction," which

counsels that "laws affecting Indians 'be construed liberally in favor of the Indians, with

ambiguous provisions interpreted to their benefit.'"  Pyramid Lake, 70 F. Supp. 3d at 541-42

(quoting Cobell v. Norton, 240 F. Supp. 3d 1081, 1101 (D.C. Cir. 2001)); see also Montana v.

Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985).  The ISDEAA similarly provides that its

provisions "shall be liberally construed for the benefit of the Indian tribe[,] . . . and any

ambiguity shall be resolved in favor of the Indian tribe."  25 U.S.C. § 5366(i).  Congress

designed the ISDEAA to "circumscribe as tightly as possible the discretion of the Secretary."

Ramah Navajo Sch. Bd. v. Babbitt, 87 F.3d 1338, 1344 (D.C. Cir. 1996).


## III.   ANALYSIS

The Court finds that it does not have subject matter jurisdiction over plaintiff's

claims.  It concludes that the ISDEAA's waiver of sovereign immunity is conditioned on the

Secretary's rejection of a Tribe's "final offer."  See 25 U.S.C. § 5366(c)(6)(A)(iii).  And plaintiff

failed to submit a "final offer" because the Secretary and plaintiff never reached a point where

they were "unable to agree, in whole or in part, on the terms of a compact or funding

agreement."  Id. § 5366(c)(1).  Absent an applicable waiver of sovereign immunity, the Court

lacks jurisdiction over plaintiff's claims and therefore will grant defendants' motion to dismiss.


### A.  Sovereign Immunity

The issue of subject matter jurisdiction arises here because plaintiff is suing the

federal government, and "[a]bsent a waiver, sovereign immunity shields the Federal Government

and its agencies from suit."  F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994).  Because "[s]overeign

immunity is jurisdictional in nature[,] . . . the 'terms of the [United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'"  Id. (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)); see also Tanana Chiefs Conf. v. Becerra, Civil Action No. 20-2902 (RDM), 2022 WL 4245487, at *4 (D.D.C. Sept. 15, 2022).

Recall that Section 5331(a) of the ISDEAA grants "[t]he United States district courts . . . original jurisdiction over any civil action or claim against the appropriate Secretary arising under" the ISDEAA.  25 U.S.C. § 5331(a).  In other words, Section 5331(a)'s waiver of sovereign immunity is conditioned on the "civil action or claim against the appropriate Secretary" arising under the ISDEAA.  Id.  Section 5366(c)(6)(A)(iii) of the ISDEAA states that "[i]f the Secretary [of the DOI] rejects a [Tribe's] final offer (or one or more provisions or funding levels in a final offer) . . . the Indian Tribe may . . . directly proceed to initiate an action in a United States district court under [S]ection 5331(a)."  25 U.S.C. § 5366(c)(6)(A)(iii).  A "civil action or claim" against the Secretary of the DOI therefore "aris[es] under" Section 5366(c)(6)(A)(iii) of the ISDEAA if—and only if—the Secretary rejects a Tribe's "final offer (or one or more provisions or funding levels in a final offer)," entitling the Tribe to challenge the Secretary's decision in federal district court under Section 5331(a).

The Court concludes that in order for a Tribe to "initiate an action in a United States district court" against the Secretary under Section 5366(c)(6)(A)(iii)—and thus for Section 5331(a)'s waiver of sovereign immunity to apply—the Secretary must first reject the Tribe's "final offer," or "one or more provisions or funding levels" of the Tribe's final offer.  See Navajo Nation II, 57 F.4th at 290 (explaining that "[w]hen the DOI declines a tribe's funding request or proposed self-determination contract, the tribe may challenge that declination in federal court." (citing 25 U.S.C. § 5331(a)); see also Navajo Nation v. U.S. Dep't of Interior,

Civil Action No. 20-1093 (DLF), 2021 WL 4243405, at *1 (D.D.C. Sept. 16, 2021) ("[i]f the Secretary declines to approve a proposed [annual funding agreement], the affected tribe may challenge the Secretary's decision in federal district court." (citing 25 U.S.C. § 5331(a)).[4]

It stands to reason, then, that in order for the Secretary to reject a Tribe's "final offer" pursuant to Section 5366(c)(6)(A), thereby waiving his or her sovereign immunity under Section 5331(a), the Tribe must first submit such an offer under Section 5366(c)(1). Though plaintiff sent a letter to the Secretary on October 23, 2023 titled "Osage Nation Final Offer Amendment to 2020-2025 Funding Agreement," the parties dispute whether that letter in fact constitutes a "final offer" under Section 5366(c)(1). See Pl. Oct. 2023, Letter at 2 (stating that the letter was plaintiff's "final offer to amend its . . . 2020-2025 [Funding Agreement].").

Plaintiff argues that the "Court's jurisdiction over [plaintiff's] claims is not dependent on the 'validity' of the final offer," noting that "there is not a single reported case in which the United States has argued that a federal court lacks jurisdiction under [the ISDEAA] to adjudicate a dispute because the final offer at issue was premature or defective." Pl. Opp. at 12.[5]

---

[4]     Plaintiff suggests that Section 5331(a)'s waiver of sovereign immunity is so broad that it waives the United States' sovereign immunity for any dispute related to the ISDEAA. See Pl. Opp. at 10. But as the Court has explained, Section 5331(a)'s plain language requires plaintiff to demonstrate that its "civil action or claim . . . aris[es] under" the ISDEAA in order for Section 5331(a)'s waiver to apply. See 25 U.S.C. § 5331(a); see also Tanana Chiefs, 2022 WL 4245487, at *4 (describing the ISDEAA's waiver of sovereign immunity as "limited.").

[5]     The Court is aware of one case in which a federal agency argued that a tribal organization failed to submit a proper "final offer." The case arose in the context of Title V of the ISDEAA, which governs the tribal self-governance program administered by the Department of Health and Human Services ("HHS") through the Indian Health Service ("IHS"). 25 U.S.C. § 5381 et seq. In Southcentral Found. v. Roubideaux, 48 F. Supp. 3d 1291 (D. Alaska 2014), IHS argued that the Southcentral Foundation's ("SCF") "final offer" was improper because "[a] 'final offer' should be submitted if 'the Secretary and a participating Indian Tribe are unable to agree, in whole or in part, on the terms of a compact or funding agreement.'" Id. at 1301 (quoting 25 U.S.C. § 5387(b)). IHS argued that SCF "never made the proposal" articulated in its "final offer," and therefore the parties had never negotiated the proposal and never reached the

Plaintiff asserts that Section 5331(a) grants federal district courts jurisdiction "over <u>any</u> civil action or claim against the appropriate Secretary arising under" the ISDEAA, and "[a] tribal claim that an agency wrongfully rejected its 'final offer' under Title IV . . . plainly arises under the [ISDEAA]." Pl. Opp. at 10 (emphasis in original). According to plaintiff, it "could not be plainer that Congress has waived sovereign immunity with respect to such tribal suits." <u>Id</u>.

      Defendants do not dispute that the ISDEAA waives the United States' sovereign immunity from actions challenging the Secretary's rejection of a Tribe's "final offer," but they argue that "[h]ere, there was no rejection because there was no final offer." <u>See</u> Defs. Reply at 6. Defendants note that the ISDEAA conditions a Tribe's submission of a "final offer" on "[i]f the Secretary and a participating Indian Tribe are unable to agree, in whole or in part, on the terms of a compact or funding agreement." Defs. Mot. at 24 (quoting 25 U.S.C. § 5366(c)(1)). Only then is the Secretary required to "make a determination with respect to the final offer." Defs. Reply at 6 (quoting 25 U.S.C. § 5366(c)(2)). And if the Secretary rejects the Tribe's final offer, the Tribe may then "directly proceed to initiate an action in a United States district court under [S]ection 5331(a)." <u>Id</u>. (quoting 25 U.S.C. § 5366(c)(6)(A)(iii)). Defendants contend that "before the Secretary is required to make a determination on a final offer and before a cause of action regarding a rejection of a final offer 'arises under' the [ISDEAA]," the Secretary and Tribe first "must 'negotiate' and have been 'unable to agree'" on the terms of a funding agreement or compact. Defs. Reply at 6 (citing 25 U.S.C. §§ 5363(a), 5366(c)(1)).

---

point where they were "unable to agree" on the proposal. <u>Id</u>. SCF countered that it had "tried to negotiate" the proposal articulated in its "final offer" for almost a year. <u>Id</u>. at 1306. On the record before it, the Court agreed with SCF, finding that "[t]he parties unsuccessfully negotiated for many months, and at some point SCF must be entitled to make a final offer." <u>Id</u>. at 1306. The Court further found that SCF had in fact previously submitted a letter to IHS that articulated a proposal that was identical to the proposal in SCF's "final offer," and therefore IHS had ample opportunity to consider plaintiff's proposal prior to SCF's submission of its "final offer." <u>Id</u>.

The Court agrees with defendants that its subject matter jurisdiction over plaintiff's claims is dependent on whether plaintiff in fact submitted a "final offer," see 25 U.S.C. § 5366(c)(1), such that the Secretary was able to reject plaintiff's final offer, see id. § 5366(c)(6)(A), allowing plaintiff to "initiate an action in a United States district court" challenging that rejection using Section 5331(a)'s waiver of sovereign immunity.  Id. § 5366(c)(6)(A)(iii).  For the reasons explained below, the Court concludes that plaintiff did not submit a "final offer" under Section 5366(c)(1), and therefore cannot initiate an action in federal district court challenging the Secretary's rejection of such an offer under Section 5331(a).

### B.  Plaintiff Did Not Submit a "Final Offer"

Plaintiff's October 23, 2023, Letter, though styled as a "final offer," is not a "final offer" under Section 5366(c)(1).  The Court analyzes plaintiff's October 23, 2023, Letter using two different frameworks:  (i) the plain text of Title IV of the ISDEAA, as amended by the PROGRESS Act; and (ii) the 2000 and 2025 regulations implementing Title IV of the ISDEAA.

### 1.  The Plain Text of Title IV of the ISDEAA

Recall that under Title IV the ISDEAA, as amended by the PROGRESS Act, an "Indian Tribe may submit a final offer to the Secretary" if the parties "are unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels)."  25 U.S.C. § 5366(c)(1).  Contrary to plaintiff's assertions that Congress "did not establish any prerequisites for submitting" a final offer, see Pl. Opp. at 12, the plain text of Section 5366(c)(1) unambiguously conditions a Tribe's submission of a "final offer" on the Secretary and the Tribe being "unable to agree, in whole or in part."  See 25 U.S.C. § 5366(c)(1).  And though plaintiff's

October 23, 2023, Letter was "explicitly labeled" as a "final offer," <u>see</u> Pl. Opp. at 12, the Court cannot elevate form over substance by ending its inquiry at the title of plaintiff's letter.

The question of whether plaintiff's October 23, 2023, Letter was a "final offer" under Section 5366(c)(1) therefore turns on whether the parties were "unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels)." 25 U.S.C. § 5366(c)(1). But what does it mean to be "unable to agree"? In common parlance, to "agree" means "to accept or concede something (such as the views or wishes of another)," to "come to terms," or "to consent to as a course of action." <u>Agree</u>, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/agree [https://perma.cc/KR8W-FA4T] (last visited August 30, 2025). In legal parlance, to "agree" means "[t]o unite in thought; to concur in opinion or purpose," or "[t]o exchange promises; to unite in an engagement to do or not do something." <u>Agree</u>, BLACK'S LAW DICTIONARY (12th ed. 2024). So if a Tribe and the Secretary are "unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels)," then one or both of the parties are incapable of accepting, conceding, coming to terms with, concurring with, or consenting to the other party's "views or wishes" concerning a proposed compact or funding agreement's terms, in whole or in part.

But as one might imagine, a party cannot agree, concede, or come to terms with another party's views or wishes concerning a compact or funding agreement if they have not discussed the document's terms. The parties must have at least one discussion where they each state their respective positions before it can even be determined that they <u>dis</u>agree. And for parties to reach the point where they are "<u>unable</u> to agree," the parties must engage in a more substantive discussion that goes beyond a mere statement of their positions. As defendants correctly observe, "[i]n virtually every negotiation, the parties start off with different positions

[and] [i]t is only through the negotiation process that they can determine that they are 'unable' to bridge that gap."  Defs. Reply at 11.  If repeated efforts to change the other party's position are unsuccessful, then the parties have likely reached the point where they are "unable to agree."

Applying these lessons to the instant case, for plaintiff and the Secretary to have reached the point where they were "unable to agree" on the terms of a funding agreement such that plaintiff could submit a "final offer" under Section 5366(c)(1), the parties had to have, at minimum:  (i) stated their positions on the terms of a proposed funding agreement; (ii) discussed the terms of the proposed funding agreement, and (iii) engaged in some form of back-and-forth dialogue—that is, negotiation—in order to change the other party's position on the proposed funding agreement's terms.  In the Court's view, the ISDEAA's plain text seems to require at least this amount of negotiation before submission of a final offer.  See 25 U.S.C. § 5366(c)(1).

When considered under this framework, plaintiff's October 23, 2023, Letter was not a "final offer" as described in Section 5366(c)(1).  In that letter, plaintiff proposed that it assume "[a]ll PSFAs associated with the Osage Agency . . . of the [BIA] that have not previously been assumed by [plaintiff], including but not limited to Realty, Minerals/Mining, Probate, Trust Services, and Executive Direction PSFAs."  Compl. at Ex. 1 [Dkt. No. 1-1] at 1.  Plaintiff also proposed that it assume its "full, proportional share of all Realty, Minerals/Mining, Probate, Trust Services, and Executive Direction PSFAs associated with the Eastern Oklahoma Regional Office . . . of the BIA."  Id.  In sum, plaintiff sought to assume several PSFAs associated with the Osage Agency of the BIA and the Eastern Oklahoma Regional Office of the BIA.  See id.

But plaintiff does not dispute that prior to submitting its October 23, 2023, Letter to the Secretary, the parties never even discussed—much less negotiated—plaintiff's assumption of the PSFAs associated with the Eastern Oklahoma Regional Office.  See Defs. Mot. at 32-34.

Plaintiff also does not dispute that prior to submitting its October 23, 2023, Letter to the Secretary, the parties never discussed or negotiated plaintiff's assumption of the Executive Direction and Trust Services PSFAs associated with the Osage Agency.  See id.  In fact, the record shows that plaintiff did not even request to negotiate any of these PSFAs prior to submitting its October 23, 2023, Letter to the Secretary.  The only PSFAs plaintiff requested to negotiate were the Real Estate Services, Probate, and Minerals PSFAs associated with the Osage Agency.  See Defs. Mot. at 33 (citing id. at Ex. 7 (Aug. 17, 2022, Negotiations Confirmation) [Dkt. No. 15-9] (Office of Self-Governance confirming plaintiff's request to negotiate the Real Estate Services, Probate, and Minerals PSFAs associated with the Osage Agency)); see also id. at Ex. 2 (Approval of Pre-Award Costs) [Dkt. No. 15-4] (plaintiff requesting pre-award costs for potential assumption of the Probate and Minerals PSFAs associated with the Osage Agency)); id. at Ex. 17 (Draft Amendment) [Dkt. No. 15-19] (plaintiff's draft amendment proposing assumption of only the "Osage Agency Branch of Field Operations.").

If plaintiff did not request to negotiate the assumption of these PSFAs, and the parties in fact never discussed plaintiff's assumption of these PSFAs, how could plaintiff have determined that the parties were "unable to agree, in whole or in part, on the terms of a compact or funding agreement" such that submission of a "final offer" was appropriate under Section 5366(c)(1)?  No "terms" for the transfer of these programs were ever discussed, and no draft funding agreement proposing assumption of these programs was ever prepared, so how could the parties have been "unable to agree" on a funding agreement's terms?  As previously explained, the parties must at least state their positions before it can even be determined that they disagree, much less that they are unable to agree.  Plaintiff's inclusion of the PSFAs associated with the Eastern Oklahoma Regional Office, as well as the Executive Direction and Trust

Services PSFAs associated with the Osage Agency, in its October 23, 2023, Letter therefore demonstrates that the letter was not a "final offer" as described in Section 5366(c)(1).

      As for what PSFAs remain at issue, the parties agree that plaintiff requested to negotiate assumption of the Real Estate Services, Probate, and Minerals PSFAs associated with the Osage Agency, and that plaintiff and the Secretary either discussed or negotiated those PSFAs at different points in time.  But the Court finds that most of these discussions amounted to mere exchanges of information, with little to no substantive follow-up by plaintiff.  The inclusion of these PSFAs in plaintiff's October 23, 2023, Letter therefore demonstrates that the letter was not a "final offer" as described in Section 5366(c)(1).  The Court addresses each PSFA in turn.

### a.  The Real Estate Services Program

      In August 2022, plaintiff requested negotiations for the transfer of the Real Estate Services program.  See Defs. Mot. at Ex. 7 (Aug. 17, 2022, Negotiations Confirmation) [Dkt. No. 15-9].  But negotiations for the Real Estate Services program were "postponed," and were not rescheduled before plaintiff submitted its October 23, 2023, Letter to the Secretary. See Defs. Mot. at 14.  Neither party alleges that any further discussion regarding transfer of the Real Estate Services program occurred before plaintiff submitted its October 23, 2023, Letter.[6]

---

[6]    In their response to plaintiff's October 23, 2023, Letter, defendants note that the Real Estate Services or "Realty" program, "has been pending before the Interior Board of Indian Appeals since negotiations ceased in 2016," because plaintiff had "already submitted a separate final offer for this program which the BIA declined, and [plaintiff] appealed."  Defs. Mot. at Ex. 5 (Dec. 20, 2023, Rejection) [Dkt. No. 15-7] at 5.  Defendants also stated that plaintiff's administrative appeal regarding transfer of the Real Estate Services program was "in mediation" at the time plaintiff submitted its October 23, 2023, Letter.  See id.  Those mediation discussions are not in the record that is currently before the Court, and therefore do not impact the Court's analysis concerning the Real Estate Services program.

Plaintiff therefore had no basis to determine that the Tribe and the Secretary were "unable to agree, in whole or in part, on the terms of a compact or funding agreement" that included transfer of the Real Estate Services program. 25 U.S.C. § 5366(c)(1). Plaintiff's inclusion of the Real Estate Services program in its October 23, 2023, Letter therefore demonstrates that the letter was not a "final offer" as described in Section 5366(c)(1).

b.  <u>The Probate Program</u>

In January 2021, plaintiff submitted a written request to the Office of Self-Governance to begin incurring pre-award costs necessary to plan, prepare for, and assume operation of the Probate program. <u>See</u> Defs. Mot. at Ex. 2 (Approval of Pre-Award Costs) [Dkt. No. 15-4] at 3-4. In April 2021, the Office of Self-Governance approved plaintiff's request. <u>See</u> Pl. Resp. to Defs. SOMF ¶ 8. Later that year, plaintiff and the BIA negotiated the transfer of responsibility for the Probate program to plaintiff. <u>See</u> Pl. Resp. to Defs. SOMF ¶ 9. During negotiations, the BIA stated its position that funding for the Probate program needed to be retained by the BIA "for the performance of inherent Federal functions." Defs. Mot. at Ex. 4 (May 6, 2021, Probate Response) [Dkt. No. 15-6]. Plaintiff does not dispute that it "did not submit a written proposal to compact functions of the Probate program" in the course of the parties' 2021 Probate negotiations. Pl. Resp. to Defs. SOMF ¶ 11; <u>see also</u> Defs. Mot. at Ex. 6 (Sept. 2, 2022, Pre-Award Costs Letter) [Dkt. No. 15-8] at 1 (plaintiff acknowledging that the parties were "not . . . able to successfully conclude [the] negotiations started in 2021.").

Then, in August 2022, the parties again engaged in negotiations concerning transfer of the Probate program. The parties discussed the BIA's May 6, 2021, Letter, which stated the BIA's position that the PSFAs of the Probate program "are inherent Federal functions that cannot be assumed by Plaintiff." Defs. Mot. at 8-9 (citing <u>id.</u> at Ex. 4 (May 6, 2021, Probate

Response) [Dkt. No. 15-6]).  In response, plaintiff requested more information about what functions of the Probate program were inherent Federal functions, but "[n]o further discussions were resumed in the negotiation meetings regarding Probate functions or the Osage Agency Probate program funding."  Defs. Mot. at 9; see also Pl. Resp. to Defs. SOMF ¶¶ 14, 16.

On September 2, 2022, plaintiff sent a letter to the BIA "following up on negotiations with respect to Probate."  Defs. Mot. at Ex. 8 (Sept. 2, 2022, Probate Letter) [Dkt. No. 15-9].  That letter did not request to assume any of the Probate program's functions or to execute a funding agreement transferring any funds of the Probate program from the BIA to plaintiff.  Instead, plaintiff merely expressed an interest in "assum[ing] as much of the Probate program as possible," and requested additional information about specific functions within the Probate program.  See id. at 1.  The BIA responded to plaintiff's letter on September 23, 2022. See Defs. Mot. at Ex. 13 (Sept. 23, 2022, Probate Letter) [Dkt. No. 15-15].

Also on September 2, 2022, plaintiff sent a letter regarding the pre-award costs that plaintiff originally requested from the Office of Self-Governance in 2021.  See Defs. Mot. at Ex. 6 (Sept. 2, 2022, Pre-Award Costs Letter) [Dkt. No. 15-8].  In that letter, plaintiff stated that it "anticipate[d]" assuming the Probate program, but was unsure whether it would assume the program in its entirety or only "some portions of the[ ] program[ ]."  Id. at 1.

In sum, throughout the parties' Probate negotiations, the BIA stated its belief that funding for the Probate program needed to be retained by the BIA for the performance of inherent Federal functions.  In response, plaintiff requested additional information about what specific functions of the Probate program were inherent federal functions and expressed a general interest in assuming as much of the Probate program as possible, but also expressed

uncertainty as to how much of the Probate program it sought to assume. That was the state of negotiations before plaintiff submitted its October 23, 2023, Letter to the Secretary.

On this record, the Court cannot conclude that plaintiff and the Secretary were "unable to agree . . . on the terms of a compact or funding agreement" that included transfer of the Probate program. 25 U.S.C. § 5366(c)(1). For one, plaintiff did not present a concrete position for the Secretary to consider: plaintiff never prepared a draft funding agreement clarifying which functions of the Probate program it intended to assume, and it never specified whether it intended to assume the entire Probate program, or merely some portions or functions of the program. And although plaintiff requested additional information about which functions of the Probate program were, in the BIA's view, "inherent Federal functions," there is no evidence in the record that plaintiff attempted to change the BIA's view on this point.

The Court concludes that plaintiff had no basis to determine that the Tribe and the Secretary were "unable to agree, in whole or in part, on the terms of a compact or funding agreement" that included transfer of the Probate program. 25 U.S.C. § 5366(c)(1). Plaintiff's inclusion of the Probate program in its October 23, 2023, Letter therefore demonstrates that the letter was not a "final offer" as described in Section 5366(c)(1).

c. <u>The Minerals Program</u>

Recall that the Minerals program has five divisions: (i) Lease Management, (ii) Accounting, (iii) Subsurface Leasing, (iv) Enforcement and Lease Compliance, and (v) Field Operations. <u>See</u> Defs. Mot. at 11 (citing <u>Osage Agency</u>, BUREAU OF INDIAN AFFAIRS, https://www.bia.gov/regional-offices/eastern-oklahoma/osage-agency); <u>see</u> <u>also</u> Pl. Resp. to Defs. SOMF ¶ 22. In January 2021, plaintiff submitted a written request to the Office of Self-Governance to begin incurring pre-award costs necessary to plan, prepare for, and assume

operation of the Minerals program.  See Defs. Mot. at Ex. 2 (Approval of Pre-Award Costs) [Dkt. No. 15-4] at 3-4; see also Pl. Resp. to Defs. SOMF ¶ 7.  Neither party alleges that any negotiation of the Minerals program in fact occurred in 2021.  See Defs. Mot. at Ex. 3 (Nov. 20, 2023, Initial Response) [Dkt. No. 15-5]; see also Pl. Resp. to Defs. SOMF ¶ 9.

    In August 2022, the parties negotiated transfer of the Minerals program. See Defs. Mot. at 8; see also Pl. Resp. to Defs. SOMF ¶ 13.  On August 23, 2022, the parties discussed the different branches of the Minerals program, and plaintiff announced its intention to assume only the Branch of Field Operations of the Minerals program for fiscal year 2023. See Defs. Mot. at 9; see also Pl. Resp. to Defs. SOMF ¶ 17.  The remainder of the negotiations on August 23 and August 24 focused on the logistics of plaintiff assuming the Branch of Field Operations.  See Defs. Mot. at 9; see also Pl. Resp. to Defs. SOMF ¶ 18 (conceding that the August 2022 negotiations "focused primarily on the Branch of Field Operations.").

    On September 2, 2022, plaintiff sent a letter to the BIA requesting "additional information" about "each branch of the Mineral program," and additional information about the Osage Agency and the Regional Office.  Defs. Mot. at  Ex. 11 (Sept. 2, 2022, Minerals Letter) [Dkt. No. 15-13] at 1-2.  Plaintiff did not request to assume any functions within the Minerals program.  See id.  The BIA provided a response to plaintiff's letter on September 28, 2022. See Defs. Mot. at Ex. 14 (Sept. 28, 2022, Minerals Letter) [Dkt. No. 15-16].

    Also on September 2, 2022, plaintiff sent a letter regarding the pre-award costs that plaintiff originally requested from the Office of Self-Governance in 2021.  See Defs. Mot. at Ex. 6 (Sept. 2, 2022, Pre-Award Costs Letter) [Dkt. No. 15-8].  In that letter, plaintiff stated it "anticipate[d]" assuming the Minerals program, but was unsure whether it would assume the program in its entirety or only "some portions of the[ ] program[ ]."  Id. at 1.

During a meeting on September 29, 2022, the parties discussed the amount of funding the BIA would transfer to plaintiff if plaintiff assumed the Branch of Field Operations of the Minerals program.  See Defs. Mot. at 12; see also Pl. Resp. to Defs. SOMF ¶ 28.  The Office of Self-Governance requested that plaintiff draft a proposed amendment to the parties' Multi-Year AFA specifying plaintiff's intent to assume the Branch of Field Operations, and also specifying the amount of funding plaintiff was requesting.  See Pl. Resp. to Defs. SOMF ¶ 28.

On October 5, 2022, the parties held another meeting, where they continued to discuss the "timeline/activities for transition of [the Branch of Field Operations] employees." Defs. Mot. at Ex. 16 (Oct. 5, 2022, Negotiations Agenda) [Dkt. No. 15-18]; see also Pl. Resp. to Defs. SOMF ¶ 29.  The parties also discussed plaintiff's draft amendment to the Multi-Year AFA, which proposed that plaintiff would "assume[] responsibility for the [BIA] Osage Agency Branch of Field Operations."  Defs. Mot. at Ex. 17 (Draft Amendment) [Dkt. No. 15-19]. Plaintiff's draft amendment did not request to assume any other division of the Minerals program other than the Branch of Field Operations, nor did it discuss any other program.  See id.

Plaintiff's draft amendment was not executed after the parties' negotiation meeting on October 5, 2022.  See Defs. Mot. at 13; see also Pl. Resp. to Defs. SOMF ¶ 32. Defendants assert that plaintiff's draft amendment was not executed "because unresolved issues remained."  Defs. Mot. at 13.  Plaintiff alleges that it "lacks knowledge of the reasons why" its draft amendment was not executed on October 5, 2022.  Pl. Resp. to Defs. SOMF ¶ 32.  The parties scheduled a follow-up meeting for October 25, 2022, but plaintiff unilaterally cancelled that meeting.  Defs. Mot. at Ex. 19 (Oct. 19, 2022, Canceled Calendar Invitation) [Dkt. No. 15-21].  Plaintiff did not propose a date to resume negotiations.  See Pl. Resp. to Defs. SOMF ¶ 34.  In November 2022, the Office of Self-Governance asked plaintiff to provide a date

for a rescheduled meeting.  See Defs. Mot. at Ex. 20 (Nov. 1, 2022, Email) [Dkt. No. 15-22].

Plaintiff replied that it was "still developing [its] request and transition plan."  Id.

Then, on November 2, 2022, plaintiff sent a letter to the Office of
Self-Governance stating that it "intends to assume all branches available at the Osage Agency
under Minerals," and requesting additional information about the Minerals program.  Defs. Mot.
at Ex. 21 (Nov. 2, 2022, Minerals Letter) [Dkt. No. 15-23].  The Office of Self-Governance
asked plaintiff to clarify whether plaintiff intends "to move forward with compacting the Field
Operations branch of the [Minerals] program," or whether plaintiff was "also requesting to
compact funding for the other branches of [the Minerals program]," or whether "compacting of
Field Operations is being postponed until [fiscal year] 2024 or a later date."  Defs. Mot. at Ex. 22
(Dec. 1, 2022, Email re: Negotiations); see also Pl. Resp. to Defs. SOMF ¶ 37.

On December 1, 2022, plaintiff replied that it had "requested additional
information" about the Minerals program and would need to "evaluate" that information before it
could "make decisions" concerning the Office of Self-Governance's inquiries.  Defs. Mot. at
Ex. 22 (Dec. 1, 2022, Email re: Negotiations) [Dkt. No. 15-24].  Plaintiff also inquired when it
could expect the information that it requested in its November 2, 2022, Letter.  See Pl. Resp. to
Defs. SOMF ¶ 38; see also Defs. Mot. at Ex. 22 (Dec. 1, 2022, Email re: Negotiations).

The next day, on December 2, 2022, the BIA sent an initial response to plaintiff's
November 2, 2022, Letter.  See Defs. Mot. at Ex. 23 (Dec. 2, 2022, Response) [Dkt. No. 15-25].
The BIA recognized that plaintiff was "still evaluating and developing its request and plan for
assumption," but assumed that plaintiff "no longer intend[ed] to proceed with negotiating and
drafting a funding agreement for [plaintiff's] assumption of the [Branch of] Field Operations" of
the Minerals program.  Id.  Then, on February 6, 2023, the BIA provided a supplemental

39

response to plaintiff's November 2, 2022, Letter.  See Defs. Mot. at Ex. 26 (Feb. 6, 2024, Supp. Resp.) [Dkt. No. 15-28]; see also Pl. Resp. to Defs. SOMF ¶ 42.   After receiving the BIA's responses, plaintiff did not request to resume negotiations and did not submit an updated draft amendment to assume any other divisions within Minerals.  See Pl. Resp. to Defs. SOMF ¶ 43.

In sum, plaintiff drafted an amendment to the parties' existing funding agreement proposing that plaintiff assume responsibility for the Branch of Field Operations.  Though the parties discussed plaintiff's draft amendment during the October 5, 2022 negotiation meeting, the draft amendment was not executed.  Plaintiff cancelled a follow-up negotiation meeting, stated that it was still developing its request, and then announced its intention to assume the entire Minerals program, not just the Branch of Field Operations.  Plaintiff requested additional information concerning the Minerals program.  The Office of Self-Governance asked plaintiff to clarify whether it intended to postpone compacting the Branch of Field Operations and instead compact funding for the other branches of the Minerals program.  Plaintiff replied that it had requested additional information about the Minerals program and needed to evaluate that information before it made any further decisions.  The BIA provided additional information in late 2022, and plaintiff submitted its "final offer" letter to the Secretary on October 23, 2023.

On this record, the Court cannot conclude that plaintiff and the Secretary were "unable to agree, in whole or in part, on the terms of a compact or funding agreement" that included transfer of the Minerals program.  25 U.S.C. § 5366(c)(1).  Though plaintiff, through its draft funding agreement in October 2022, stated a firm position regarding the Branch of Field Operations, plaintiff changed its position in November 2022:  instead of just the Branch of Field Operations, plaintiff announced its intention to assume the entire Minerals program.  And despite the Office of Self-Governance and the BIA repeatedly prompting plaintiff to clarify the logistics

of its new position, plaintiff merely requested additional information, received additional information from the BIA, and then submitted its October 23, 2023, Letter.

The Court concludes that plaintiff had no basis to determine that plaintiff and the Secretary were "unable to agree, in whole or in part, on the terms of a compact or funding agreement" that included transfer of the entire Minerals program.  25 U.S.C. § 5366(c)(1).  Plaintiff's inclusion of the entire Minerals program in its October 23, 2023, Letter therefore demonstrates that the letter was not a "final offer" as described in Section 5366(c)(1).

Having analyzed each of the programs included in plaintiff's October 23, 2023, Letter, the Court finds that plaintiff and the Secretary never reached the point where they were "unable to agree, in whole or in part, on the terms of a compact or funding agreement" with respect to the programs identified in plaintiff's letter.  See 25 U.S.C. § 5366(c)(1).  Accordingly, plaintiff's October 23, 2023, Letter does not constitute a "final offer" under Section 5366(c)(1).

2.   The ISDEAA's 2000 and 2025 Implementing Regulations

As discussed, regulations implementing the ISDEAA were promulgated in 2000.  See 25 C.F.R. Part 1000 (2000).  At the time plaintiff filed suit in March 2024, the 2000 regulations were in effect.  But on January 10, 2025, the DOI promulgated final regulations implementing Title IV of the ISDEAA, as amended by the PROGRESS Act.  See 89 Fed. Reg. 100228 (codified at 25 C.F.R. Part 1000).  The 2025 regulations were not yet final when plaintiff filed suit in March 2024, and the parties agree that these new regulations are not applicable to the instant case.  See Defs. Reply. at 18 ("It is uncontested that the regulations in effect at the time of the suit apply and not any merely proposed regulations."); see also Pl. Opp. at 13 n.7 ("The recently proposed draft regulations for final offers under Title IV . . . are inapplicable here.").

41

The Court has already determined that plaintiff's October 23, 2023, Letter does not constitute a "final offer" under the plain text of the ISDEAA, irrespective of the statute's implementing regulations.  But the differences—and indeed, the substantial similarities—between the ISDEAA's 2000 regulations and the new 2025 regulations further illustrate why plaintiff's October 23, 2023, Letter does not constitute a "final offer" under Section 5366(c)(1).

a.  The 2000 Regulations

Recall that the 2000 regulations "provide the process and timelines for negotiating a self-governance compact with the [DOI] and an AFA with any bureau."  25 C.F.R. § 1000.160. The negotiation process mandated by the 2000 regulations is rigorous—for example, during the "information phase," a Tribe may submit a "letter of interest," which is "the initial indication of interest submitted by the [Tribe] informing the bureau of the [Tribe's] interest in seeking information for the possible negotiation of one or more bureau programs."  Id. § 1000.170.  Once the parties enter the "negotiation phase," the regulations dictate how and when the BIA must respond to a Tribe's request to negotiate, see id. § 1000.174, how negotiations must be conducted, see id. § 1000.175, and seven issues that the parties must address at meetings:

> (a) The specific Tribe/Consortium proposal(s) and intentions;
> (b) Legal or program issues that the bureau or the Tribe/Consortium identify as concerns;
> (c) Options for negotiating programs and related budget  amounts, including mutually agreeable options for developing alternative formats for presenting budget information to the Tribe/Consortium;
> (d) Dates for conducting and concluding negotiations;
> (e) Protocols for conducting negotiations;
> (f) Responsibility for preparation of a written summary of the discussions; and
> (g) Who will prepare an initial draft of the AFA.

25 C.F.R. § 1000.176(a)-(g).

The 2000 regulations contemplate that the parties' negotiations will culminate in a draft funding agreement for the programs the Tribe seeks to assume, see 25 C.F.R. § 1000.175, but if the parties "do not reach agreement during the negotiation phase by the mutually agreed to date for completing negotiations," the regulations provide that the Tribe and the Secretary "may each make a last and best offer to the other party." Id. § 1000.179(a).

In sum, the 2000 regulations provide a very detailed and rigorous process that governs how the BIA and Indian tribes negotiate, and allow a Tribe or the BIA to submit a "last and best offer" only if the parties fail to reach an agreement "during the negotiation phase by the mutually agreed to date for completing negotiations." 25 C.F.R. § 1000.179(a).

b.  The 2025 Regulations

The AFA negotiation process described in the 2025 regulations is largely identical to the negotiation process described in the 2000 regulations. Just like the 2000 regulations, the 2025 regulations describe a precursor to the negotiation process called the "information phase," during which a Tribe sends the Secretary "a written request" notifying the Secretary of the Tribe's "interest in negotiating for" one or more programs and "request[ing] information about the programs." 25 C.F.R. § 1000.1020. The 2025 regulations also provide detailed instructions for how a Tribe may initiate the "negotiation phase," id. § 1000.1040, how and when the BIA must respond to a Tribe's negotiation request, id. at § 1000.1045, a step-by-step process for conducting the negotiation phase, id. at § 1000.1055, and seven specific issues that the bureau and the Tribe must discuss at negotiation meetings. See id. at § 1000.1060.

Just like the 2000 regulations, the 2025 regulations contemplate that negotiations will culminate in a draft funding agreement. See 25 C.F.R. § 1000.1060(g). But the main difference between the 2025 regulations and the 2000 regulations as it relates to the negotiation

43

process for AFAs is that the 2025 regulations implement the new "final offer" process described in Section 5366(c) of the ISDEAA.  See 25 U.S.C. § 5366(c); see also 25 C.F.R. § 1000.1070. The 2025 regulations provide that "if the [Tribe] and bureau negotiators fail to reach an agreement on a compact or funding agreement,"—that is, if they "are unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels)"—then the Tribe may submit a "final offer" pursuant to Subpart I of the regulations.  Id. § 1000.1070.

Subpart I of the 2025 regulations "explains the final offer process provided by the [ISDEAA] for resolving, within a specific timeframe, disputes that may develop in negotiation of compacts, funding agreements, or amendments thereof."  25 C.F.R. 1000.1101 (emphasis added).  The regulations provide that the Tribe "may submit a final offer when it has determined that the [Tribe] and the Secretary are unable to agree, in whole or in part, on the terms of a compact, funding agreement, or amendment (including funding levels)."  Id. § 1000.1105.  A Tribe's "final offer must contain a description of the disagreement between the Secretary and the [Tribe], the [Tribe's] final proposal to resolve the disagreement, including any draft proposed terms to be included in a compact, funding agreement, or amendment . . . ."  Id. § 1000.1115.

c.  Application to Plaintiff's October 23, 2023, Letter

Though plaintiff concedes that the 2025 regulations are not applicable to this case, see Pl. Opp. at 13 n.7, it notes that the 2025 regulations provide that "a final offer should be submitted when a tribe has determined that the parties are unable to agree," and "[t]here is no provision for the agency to challenge the tribe's determination that a final offer is warranted." Id. at 15.  Plaintiff argues that "[r]equiring tribes to satisfy [the 2000 regulations' negotiation provisions] before submitting a final offer would eviscerate the final offer mechanism, whose purpose is to enable tribes to obtain a prompt, appealable decision from the agency when the

parties disagree about the scope or funding of a compact." Pl. Opp. at 15. Plaintiff further argues that Title IV's new "final offer provision is meant to flesh out and bring closure to substantive disputes about a compact or funding agreement, not to generate additional procedural disputes about whether a final offer is permissible." Id. at 16.

        The 2000 regulations provided that if the parties "do not reach agreement during the negotiation phase by the mutually agreed to date for completing negotiations," the Tribe and the Secretary "may each make a last and best offer to the other party." 25 C.F.R. § 1000.179(a) (2000). The 2025 regulations, in contrast, place the "final offer" ball firmly in the Tribe's court: once a Tribe determines that it and the Secretary are "unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels)," then the Tribe may submit a "final offer." Id. § 1000.1070 (2025). But the 2025 regulations and Section 5366(c) of the ISDEAA, as amended by the PROGRESS Act, include the same precondition for submission of a final offer: the parties must be "unable to agree." Compare id. § 1000.1070 (2025), with 25 U.S.C. § 5366(c)(1). And the detailed negotiation process for AFAs described in Subpart G of the 2000 regulations was transferred, with very little modification, to Subpart H of the 2025 regulations. Compare 25 C.F.R. § 1000.175 (2000), with 25 C.F.R. § 1000.1055 (2025).

        In the Court's view, the 2025 regulations contemplate that the "final offer" process follows from the negotiation phase, not the other way around. The 2025 regulations describe the "final offer process" as a means to "resolv[e], within a specific timeframe, disputes that may develop in negotiation of compacts, funding agreements, or amendments thereof." 25 C.F.R. 1000.1101 (2025) (emphasis added). In addition, the 2025 regulations provide that a Tribe's "final offer must contain a description of the disagreement between the Secretary and the Tribe/Consortium." Id. § 1000.1115 (emphasis added). These provisions contemplate some

form of discussion and negotiation before the "final offer" mechanism is triggered.  Plaintiff's

argument that the 2025 regulations subvert the need for negotiation entirely therefore is not a

natural reading of the ISDEAA's plain text or its 2000 and 2025 implementing regulations.

      In sum, regardless of whether one looks to the 2000 regulations or the 2025

regulations, plaintiff's October 23, 2023, Letter does not constitute a "final offer" as described in

Section 5366(c)(1) of the ISDEAA.  It is a statutory and a regulatory requirement that the Tribe

and the Secretary be "unable to agree, in whole or in part, on the terms of a compact, funding

agreement, or amendment (including funding levels)" before a Tribe may submit a "final offer."

See 25 U.S.C. § 5366(c)(1); see also 25 C.F.R. § 1000.1105 (2025).  And this requirement

necessitates some form of negotiation in accordance with the ISDEAA's regulations.

### C.  Plaintiff's Remaining Arguments

      Plaintiff's remaining arguments are unavailing.  First, plaintiff argues that

although "defendants' motion spends many pages recounting chapter and verse of [the parties']

negotiations[,] . . . the details of the negotiations are immaterial" because the 2000 regulations'

negotiation requirements were "superseded" by the "final offer" mechanism enacted in the 2020

amendments to Section 5366(c)(1) of the ISDEAA.  Pl. Opp. at 8 n.4; see also id. at 6 (noting

that Section 5373(d)(2) of the ISDEAA, as amended by the PROGRESS Act in 2020, provides

that Title IV "shall supersede any conflicting provision of law (including any conflicting

regulations).").  But the Court need not consider this argument because, as explained, plaintiff's

October 23, 2023, Letter does not fulfill Section 5366(c)(1)'s requirements for a "final offer,"

notwithstanding the statute's 2000 implementing regulations.  See supra at Section III.B.1.

As discussed, some level of negotiation is both a statutory and a regulatory requirement.

Second, plaintiff argues that "[a]s a matter of logic or policy . . . [t]ribes that are engaged in productive negotiations with BIA . . . have no motive to invoke the final offer process."  Pl. Opp. at 13.  According to plaintiff, "[s]ubmission of a final offer indicates that the parties have been unable to reach agreement through negotiation and the tribe has decided it must force the issue."  Id.  Plaintiff suggests that its submission of a "final offer" to the Secretary under Section 5366(c)(1) therefore is itself evidence that the parties were "unable to agree."  But the Court need not decide whether the chicken or the egg—the parties' disagreement or the final offer—comes first:  Section 5366(c)(1) states that if the Secretary and a Tribe are "unable to agree, in whole or in part, on the terms of a compact or funding agreement," then the Tribe "may submit a final offer to the Secretary."  25 U.S.C. § 5366(c)(1).  Plaintiff's interpretation of Section 5366(c)(1)—that a Tribe's submission of a "final offer" is prima facie evidence that the parties were "unable to agree"—is not a natural reading of the statute's text.

Lastly, plaintiff argues that there should not be hurdles to submitting a "final offer" because "[t]he final offer provision is meant to flesh out and bring closure to substantive disputes about a compact or funding agreement, not to generate additional procedural disputes about whether a final offer is permissible."  Pl. Opp. at 16.  But as defendants convincingly argue, tribes "cannot 'bring closure to substantive disputes' if [they do] not engage in negotiations that would identify such disputes."  Defs. Reply at 23.  Without the negotiations contemplated by Title IV of the ISDEAA and its implementing regulations, the Secretary will be unable to determine "whether it is possible to obtain [a] tribe's goals and avoid a rejection."  Id.

47

For all of these reasons, it is hereby

ORDERED that defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction or, in the Alternative, for Summary Judgment [Dkt. No. 15] is GRANTED.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 9/17/25